IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:24-CV-1063

| | |
|---|---|
| CLEAR BLUE INSURANCE COMPANY, and CLEAR BLUE SPECIALTY INSURANCE COMPANY, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) **COMPLAINT** |
| v. | )<br>) |
| SWYFFT, LLC, and CORE PROGRAMS, LLC, | )<br>)<br>) |
| Defendants. | ) |

Plaintiffs Clear Blue Insurance Company ("CBIC") and Clear Blue Specialty Insurance Company ("CBSIC") (collectively, "Clear Blue" or "Plaintiffs") bring this action for breach of contract and breach of the implied covenant of good faith and fair dealing and seek affirmative injunctive relief/specific performance against Defendants Swyfft, LLC ("Swyfft") and Core Programs, LLC ("Core") (collectively, "Defendants") (Defendants collectively with Plaintiffs, "Parties") and allege as follows:

## PARTIES

1. Clear Blue is a fronting specialist insurance company that offers property and casualty insurance in partnership with managing general agents ("MGAs"). As a fronting specialist insurance company, Clear Blue works with MGAs and reinsurers to produce and provide a wide variety of insurance coverages nationwide in 50 states. In such joint ventures, Clear Blue delegates full underwriting, binding, and servicing authority to its partner MGAs. Clear Blue has an "A-" (Excellent) rating from the leading insurance rating company, AM Best.

2. Swyfft is an insurance agency and MGA. Swyfft underwrote, bound, and serviced certain homeowners' insurance issued by Clear Blue.

3. Core is an insurance agency and MGA. Core underwrote, bound, and serviced certain commercial habitational insurance for apartments and other dwellings issued by Clear Blue.

## JURISDICTION AND VENUE

4. Both CBIC and CBSIC are Texas-domiciled insurance companies with their principal place of business in Texas.

5. As corporations, CBIC and CBSIC's "citizenship" for diversity-jurisdiction purposes is determined by both their state of incorporation and state in which their principal place of business is located.

6. As a result, CBIC and CBSIC are "citizens" of Texas for diversity-jurisdiction purposes.

7. Swyfft and Core are both organized under the laws of New Jersey.

8. As LLCs, Swyfft and Core's "citizenship" for diversity-jurisdiction purposes is dependent on the citizenship of their members.

9. Upon information and belief, Swyfft (as an LLC) is a citizen of South Carolina, Utah, and Florida. Swyfft's members—Richard Trezza, Sean Maher, One Click Partners, LLC, and Rex Financial Partners, LLC—have the following citizenships: Richard Trezza is a citizen of South Carolina; Sean Maher is a citizen of Utah; One Click Partners, LLC is a citizen of Florida because its sole member, Vincent J. Dowling, Jr., is a citizen of Florida; and Rex Financial Partners, LLC, upon information and belief, is not a citizen of Texas.

10. Upon information and belief, Core (as an LLC) is a citizen of at least South Carolina and Utah. Upon information and belief, Core's members—Richard Trezza and Sean Maher—have the following citizenships: Richard Trezza is a citizen of South Carolina; and Sean Maher is a citizen of Utah.

11. Therefore, none of the Defendants is a citizen of the same state as any of the Plaintiffs.

12. Because the Parties are completely diverse and the amount in controversy exceeds $75,000, this Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

13. This Court has personal jurisdiction over Defendants consistent with the principles underlying the U.S. Constitution and N.C. Gen. Stat. § 1-75.4.

14. Defendants have regularly and intentionally conducted business in North Carolina and this District and are subject to personal jurisdiction in North Carolina and this District by virtue of their contacts here.

15. Clear Blue entered into a General Agency Agreement with Swyfft effective January 1, 2017 (the "Swyfft GAA") for the production of a program for underwriting, binding, and servicing certain homeowners' insurance policies (the "Swyfft Program").

16. Clear Blue entered into a General Agency Agreement with Core effective March 21, 2016 (the "Core GAA") for the production of a program for underwriting, binding, and servicing certain commercial habitational insurance policies for apartments and other dwellings (the "Core Program").

17. The Swyfft GAA and Core GAA state that the "[a]greement[s] shall be deemed performable at the Company's [Clear Blue's] administrative office in Charlotte, North Carolina."

18. Swyfft and Core have administered the Swyfft Program and Core Program in numerous states, including North Carolina. Swyfft and Core therefore have administered and solicited business for the Swyfft Program and Core Program in North Carolina.

19. The specific contract at issue in this litigation—the "Reimbursement Funding Agreement" ("RFA")—is dated February 9, 2022, which Clear Blue and Swyfft and Core entered into several years after having entered into the Swyfft GAA and Core GAA.

20. The RFA contains a forum-selection clause that vests jurisdiction over disputes concerning the RFA in the federal courts in Charlotte, North Carolina. A true and correct copy of the RFA is attached as **Exhibit 1** and is incorporated by reference as if fully set forth herein. (Ex. 1, RFA ¶ 6). The Parties thus contractually agreed in advance to submit themselves to personal jurisdiction in the Western District of North Carolina.

21. Venue is proper pursuant to 28 U.S.C. § 1391 because, as mentioned above, a substantial part of the events giving rise to this Complaint happened in this District. Venue is also proper pursuant to the RFA's forum-selection clause. (Ex. 1, RFA ¶ 6).

## FACTUAL ALLEGATIONS

*Background*

22. This dispute arises out of Clear Blue's relationship with Swyfft and Core, which served as the MGAs for Swyfft Program and Core Program, respectively.

23. As stated earlier, Swyfft underwrote, bound, and serviced homeowners' insurance policies for the Swyfft Program, and Core underwrote, bound, and serviced commercial habitational insurance policies for the Core Program.

24. Clear Blue is a fronting insurance company. As such, Clear Blue cedes 100% of the risk associated with its policies to reinsurers, through a combination of various types of reinsurance, including quota share reinsurance, catastrophe/excess of loss reinsurance ("Cat/XOL"), and reinstatement premium protection ("RPP").

25. The reinsurance purchased by Clear Blue on behalf of the Swyfft Program and Core Program was crucial to the operation of both—a fact that Swyfft and Core well understood. Indeed, Swyfft and Core had been remitting premium produced by the Swyfft Program and Core Program (*i.e.*, premium collected from policyholders) to fund all costs for the Swyfft Program and the Core Program, of which reinsurance costs were a major part.

26. It is standard in the fronting insurance industry for premium collected by the MGA to fully fund reinsurance premium costs.

27. Swyfft and Core—as the MGAs of the Swyfft Program and Core Program, respectively—were responsible for collecting all premium from policyholders under the programs.

28. Swyfft and Core understood that the entire business model of insurance programs involving fronting insurance companies depends upon using premium collected from policyholders to fund all costs for the Swyfft Program and Core Program—including all reinsurance costs.

*Qatar Re's Exit as Reinsurer in 2021 and RFA Negotiation*

29. From 2016 through 2021 (for the Core Program) and from 2017 through 2021 (for the Swyfft Program), Qatar Reinsurance Company, Ltd. ("Qatar Re") served as the quota share reinsurer for the two programs. However, in June 2021, Qatar Re declined to participate in the Swyfft Program and the Core Program on a going-forward basis, and therefore the Swyfft Program and Core Program needed new quota share reinsurance as well as Cat/XOL and RPP.

30. Following Qatar Re's exit in June 2021, Aon (the reinsurance broker) worked with Swyfft and Core to place new reinsurance for the Swyfft Program and Core Program, respectively.

31. Due to the changed circumstances surrounding the Swyfft Program's and Core Program's reinsurance provider, on or about February 9, 2022, Clear Blue and Swyfft and Core entered into the RFA. (Ex. 1, RFA). The RFA acknowledged that Clear Blue and Swyfft and Core had entered into separate contracts many years earlier—the Swyfft GAA and the Core GAA—which established the Swyfft Program and Core Program, respectively.

32. Importantly, the RFA was *not* an amendment to the Swyfft GAA or the Core GAA but rather was its own contractual agreement.

33. The Parties amended the Swyfft GAA *ten times* and the Core GAA *five times*, and each amendment stated that it was "Amendment No. _" to the Swyfft GAA or Core GAA, respectively.

34. Some of these amendments to both the Swyfft GAA and the Core GAA were executed after Qatar Re exited the Swyfft Program and Core Program.

35. Clearly, the Parties knew how to amend the Swyfft GAA and Core GAA—and the RFA was not styled as an amendment or contemplated to be an amendment.

36. The RFA provided a distinct and separate remedy as well as a distinct and separate dispute resolution provision that calls for litigation in this Court.

37. The parties knew how to provide for arbitration as a dispute resolution mechanism, which the parties provided for in detail in the Swyfft GAA and Core GAA. In the RFA, in contrast, the parties specifically omitted arbitration and instead specified federal court.

6

Case 3:24-cv-01063-KDB-SCR   Document 1   Filed 12/10/24   Page 6 of 14

38. The same person—the Chief Legal Officer of Clear Blue—drafted the dispute resolution provisions in the RFA as well as the Swyfft GAA and Core GAA, further demonstrating that the RFA was intended to be litigated (if necessary) in this Court—not arbitrated.

39. Executives for both parties—Clear Blue and Swyfft/Core—actively negotiated the RFA and were well aware of the forum-selection provision in the RFA.

40. Pursuant to the RFA, the Parties agreed that given that "a new panel of reinsurers" had been formed with respect to the Swyfft Program and Core Program, it was necessary "to memorialize their agreements regarding future funding and reimbursement guarantees to [Clear Blue] in connection with reinsurance on the Programs." (Ex. 1, RFA ¶ C-D).

41. The RFA memorialized certain Swyfft and Core "[p]ayment [o]bligations" "to fund, reimburse and guarantee prompt payment to CBIC for the potential Program Costs…if and when they become payable to reinsurers or [Clear Blue]." (Ex. 1, RFA ¶ 1). Clear Blue would send a payment request to Swyfft and Core, which was payable within thirty days.

42. "Program Costs" were defined in the RFA to include: (1) "purchase of / payment for (i) additional reinstatements / Reinstatement Premium Protection ('RPP')"; (2) "funding of any future slide commission obligations incurred by [Clear Blue] to any Reinsurers, based on the Programs, including without limitation return of commission funds"; and (3) "funding of any losses incurred in excess of any attritional loss ratio caps." (Ex. 1, RFA ¶ 2(a)-(c)).

43. The Parties also negotiated for a default procedure and a separate and distinct remedy in the event of default. Under the terms of the RFA, if a "Payment Request"—defined as a written request by Clear Blue to Swyfft and Core for payment of Program Costs—was not "fully funded, paid or reimbursed by the indicated due date," Clear Blue would "send a written notice of default ('*Preliminary Default Notice*')" to Swyfft and Core. Assuming the Payment Request was

7

"fully completed within fifteen (15) calendar days after receipt of the Preliminary Default Notice, it [would] be null and void." Still, if the Preliminary Default Notice was sent and the 15-day period elapsed, Clear Blue was entitled to send a "Second Default Notice." (Ex. 1, RFA ¶ 4).

44. Once a Second Default Notice was sent, the RFA specified that "if all outstanding Defaults are not Fully Cured within nine (9) months after the Second Default Notice[,]…Swyfft [and Core][1] shall convey the Default Stock to Clear Blue." *Id.* "Default Stock" was separately defined in Section 5 of the RFA, as set forth below.

45. Clear Blue and Swyfft and Core negotiated at arms-length for inclusion of a separate and distinct remedy in the RFA in the event that Swyfft and Core failed to remit payment for Program Costs as defined in the RFA. Paragraph 5, entitled "Uncured Default – Stock Transfer," specified:

> [u]pon a Final / Uncured Default, [Clear Blue] is entitled to receive from Owner an amount of voting common equity ('*Stock*') of Swyfft [and Core] equal to twenty percent (20%) of the then-outstanding Stock from Owner ('*Default Stock*'). The transfer of such Default Stock (i) shall be completed within forty five (45) calendar days after the Final Default Date, (ii) shall transfer the Default Stock to [Clear Blue] or its nominee without any liens or encumbrances, (iii) shall be completed with an equity/stock transfer agreement and the books/records of Swyfft [and Core] shall be properly updated for such event, (iv) may require [Clear Blue] to enter any operating agreement, stockholder agreement, or other arrangements in place for then-existing equity holders of Swyfft [and Core]. Only one (1) Stock Transfer is available under this Agreement.

(Ex. 1, RFA ¶ 5).

---

[1] The RFA defined "Swyfft" to include both Swyfft and Core. Therefore, all references to transfer of Swyfft stock also include transfer of Core's stock under the RFA.

46. Although the Swyfft GAA and Core GAA already obligated Swyfft and Core to remit premium sufficient to fund the Swyfft Program's and Core Program's costs, including reinsurance costs, the RFA reflected new considerations and a separate and distinct remedy:

    a. Swyfft and Core would benefit from a continued Swyfft Program and Core Program; and

    b. Clear Blue would benefit from an additional and necessary remedy that justified the continuation and associated increased risks of the Swyfft Program and Core Program.

47. In addition, failure to pay program costs would have harmed Clear Blue in an amount exceeding the specific amount of those costs.

48. The remedy in the RFA is equitable in nature and ensures Clear Blue could obtain certain intangible rights, including voting rights, the right to participate in the management of Swyfft and Core, rights to inspect the books and records of Swyfft and Core, and rights to receive any dividend distributions.

*Swyfft and Core's Uncured Default*

49. On January 11, 2024, Clear Blue sent a Payment Request to Swyfft and Core, as contemplated by the RFA. That amount included $24,556,078 for RPP costs for 2022 and 2023. A true and correct copy of the January 2024 letter that Clear Blue sent to Swyfft and Core with the Payment Request is attached as **Exhibit 2** and is incorporated by reference as if fully set forth herein. (Ex. 2, Payment Request Letter). As stated in the letter, such RPP costs were purchased on behalf of Swyfft and Core and the Swyfft Program and the Core Program. Such RPP coverage created required reinsurance capacity for the Swyfft Program and Core Program, without which the programs could not operate.

50. Swyfft and Core, however, failed to remit requested RPP coverages to Clear Blue and comply with the Payment Request within thirty days.

51. Clear Blue then sent a "Preliminary Default Notice" on February 19, 2024. Clear Blue reiterated its demand for $24,556,078 of RPP coverages, specifying a payment due date of March 6, 2024—15 days after the Preliminary Default Notice, as contemplated by the RFA. A true and correct copy of the Preliminary Default Notice is attached as **Exhibit 3** and is incorporated by reference as if fully set forth herein. (Ex. 3, Preliminary Default Notice; Ex. 1, RFA ¶ 4).

52. Again, Swyfft and Core failed to cure their default under the RFA.

53. Clear Blue then sent a "Second Default Notice" on March 7, 2024. In the notice, Clear Blue again reiterated Swyfft and Core's payment obligations from the previous correspondence and indicated that the requested funds "must be received by Clear Blue no later than December 9, 2024." The notice cautioned that "if the Total Amount Demanded by Clear Blue is not received by Clear Blue by December 9, 2024, Swyfft [and Core] will be obligated to convey twenty percent (20%) of the outstanding Stock of Swyfft [and Core] to Clear Blue." A true and correct copy of the Second Default Notice is attached as **Exhibit 4** and is incorporated by reference as if fully set forth herein. (Ex. 4, Second Default Notice, ¶¶ 4, 6).

54. Again, Swyfft and Core failed to cure their default under the RFA.

55. Clear Blue also terminated the Swyfft Program and Core Program.

56. On December 9, 2024—the last day of the cure period under the RFA—Clear Blue sent a third and final "Notice of Uncured Default" ("Third Default Notice") (although not contractually required to do so) to Swyfft and Core reiterating their payment obligations from the previous correspondence. A true and correct copy of the Third Default Notice is attached as **Exhibit 5** and is incorporated by reference as if fully set forth herein. (Ex. 5, Third Default Notice).

57. Once again, Swyfft and Core failed to cure their default under the RFA.

58. To date, Swyfft and Core have failed to reimburse Clear Blue for their unpaid Program Costs, as required under the RFA. Because nine months have passed since Clear Blue sent Swyfft and Core the Second Default Notice on March 7, 2024, and the Default remains uncured, Clear Blue is entitled to "an amount of voting common equity ('Stock') of Swyfft equal to twenty percent (20%) of the then-outstanding Stock[.]"

*Breach of the GAAs Is Not at Issue in this Litigation*

59. The focus of this litigation concerns Swyfft and Core's breach of the RFA—specifically, their failure to reimburse Clear Blue for Program Costs, as specified in Section 2 of the agreement. (Ex. 1, RFA ¶ 2).

60. Clear Blue does not seek relief from Swyfft and Core under the Swyfft GAA and Core GAA in this litigation.

61. Notably, the Swyfft GAA and Core GAA contain an arbitration clause regarding disputes concerning the GAAs. Specifically, the Swyfft GAA and Core GAA mandate the following: "Any dispute between any Party arising out of the provisions of this [GAA] or its termination, or concerning its interpretation or validity, whether arising before or after termination of this [GAA], shall be submitted to arbitration in the manner set forth in this Article." (Swyfft GAA § 12.01; Core GAA § 13.01)[2]

62. In contrast, the RFA contains a forum-selection clause providing that "all disputes shall have jurisdiction in the federal courts located in Charlotte, NC[.]" (Ex. 1, RFA ¶ 6).

---

[2] Further, the Swyfft GAA and Core GAA contain a confidentiality provision regarding the existence of any arbitration between the Parties: "Confidentiality. Except as may be required by law or required to secure a judgment on the arbitration award, neither the Parties nor the arbitrators shall disclose the existence, content or results of any arbitration conducted hereunder without the prior written consent of the Parties."

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

63. Clear Blue repeats and realleges Paragraphs 1 through 62 above, which are incorporated by reference herein.

64. Clear Blue and Swyfft and Core are parties to the RFA, which is a valid and enforceable contract.

65. Clear Blue has at all times performed its obligations under the Agreement and reasonably expected Swyfft and Core to fulfill its Payment Requests for Program Costs, including RPP.

66. Swyfft and Core have materially breached the RFA in several ways including without limitation their failure to remit sufficient premium to fund Program Costs and to fulfill Clear Blue's Payment Request, as detailed in this Complaint.

67. The facts alleged here are not in dispute: Clear Blue sent three notices to Swyfft and Core regarding their payment obligations. All three notices have been disregarded, and Swyfft and Core have failed to timely cure their default.

68. Swyfft and Core have been harmed by Swyfft and Core's breach of the RFA, beyond mere nonpayment of the amounts requested in the Payment Request.

69. The Court should uphold the plain language of the contract and grant Clear Blue specific performance with respect to the stock transfer for which the Parties negotiated: 20% of the voting common equity stock of Swyfft and Core. (Ex. 1, RFA ¶ 5).

## SECOND CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

70. Clear Blue repeats and realleges Paragraphs 1 through 69 above, which are incorporated by reference herein.

71. Swyfft and Core have breached the implied covenant of good faith and fair dealing by blatantly disregarding contractual obligations under the RFA without justification. Swyfft and Core's narrow reading of the term "Program Costs" is not in good faith and does not reflect the Parties' negotiations or the plain language of the contract.

72. Program Costs—broadly including "[R]einstatements" and "RPP," as detailed in section 2 of the RFA—are not limited solely to such costs from 2021. The RFA contains no such limitation. To read the RFA otherwise is not in good faith.

73. At all times, Clear Blue acted in accordance with the relevant provisions of the RFA.

74. Clear Blue has been damaged as a result of Swyfft's and Core's breaches of the duty of good faith and fair dealing.

## THIRD CLAIM FOR RELIEF
(Affirmative Permanent Injunction/Specific Performance)

75. Clear Blue repeats and realleges Paragraphs 1 through 74 above, which are incorporated by reference herein.

76. Swyfft and Core's failure to remit premium to reimburse Clear Blue for demanded Program Costs, as defined in the RFA, has irreparably damaged Clear Blue.

77. For the reasons stated above, remedies available at law are inadequate to compensate Clear Blue for the irreparable injury, and the Parties specifically negotiated for an equitable remedy in the RFA equal to 20% of the voting common equity stock of Swyfft and Core in the event of uncured default. (Ex. 3, RFA ¶ 5). Rights to which Clear Blue would be entitled following the stock transfer (and which are not attainable through an award of monetary damages) include without limitation: voting rights, the right to inspect books and records, and the right to receive dividend distributions.

78. The balance of hardships between the Parties by granting the affirmative permanent injunction/specific performance weighs heavily toward Clear Blue and is thus warranted.

79. The public interest would be served by ordering the affirmative permanent injunction/specific performance.

WHEREFORE, Clear Blue respectfully prays the Court for the following:

1. That the Court grant Clear Blue affirmative injunctive relief/specific performance for Swyfft and Core's uncured default on Clear Blue's Payment Request pursuant to the RFA, and order that Swyfft and Core each transfer 20% of their voting common equity stock to Clear Blue by upholding the plain language of the contract pursuant to Section 5 of the RFA.

2. That the Court award Clear Blue any such other and further relief as the Court may deem just and proper.

Dated this 10th day of December, 2024.    Respectfully submitted,

By: */s/ Fielding E. Huseth*
Mark A. Nebrig, N.C. State Bar 28710
Fielding E. Huseth, N.C. State Bar 53121
Raquel M. Pearkes, N.C. State Bar 54905
Emily S. Carney, N.C. State Bar 55001
MOORE & VAN ALLEN PLLC
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
marknebrig@mvalaw.com
fieldinghuseth@mvalaw.com
raquelpearkes@mvalaw.com
emilycarney@mvalaw.com

*Attorneys for Plaintiffs Clear Blue Insurance Company and Clear Blue Specialty Insurance Company*